FILED

2005 Dec-14  PM 03:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| **HERMAN J. GREEN, on behalf of himself and a class of persons similarly situated,** | ) |
| | ) |
| **PLAINTIFFS,** | ) |
| **VS.** | )            **7:04-cv-1305-VEH** |
| **MICHAEL H. HOLLAND, MARTY D. HUDSON, STEVEN F. SCHAAB, B.V. HYLER, et al., as Trustees of the UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN; and the UNITED MINE WORKERS OF AMERICA HEALTH AND RETIREMENT FUNDS,** | ) ) ) ) ) ) |
| **DEFENDANTS.** | ) |

---

## MEMORANDUM OF DECISION

The court has before it two motions for summary judgment.  Plaintiff

Herman Green, on behalf of himself and a class of persons similarly situated, filed

a motion (doc. # 32) for partial summary judgment on April 25, 2005.  Defendants

Trustees of the United Mine Workers of America ("UMWA") 1974 Pension Plan

(collectively "the Trustees") filed a motion (doc. #35) for summary judgment on

May 16, 2005.   Pursuant to the court's April 22, 2005, June 17, 2005, and August

18, 2005 orders, the motion was deemed submitted, without oral argument, on August 29, 2005.

## I. Procedural History

Plaintiff Herman J. Green commenced this action on June 23, 2004 by filing a class action complaint in this court alleging violations of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132.  Plaintiff contends that defendants' refusal to pay interest on disability benefits violated section 502 of ERISA.  Green and the Trustees both filed motions for summary judgment, asserting that no genuine issue of material fact exists and that each is entitled to judgment as a matter of law.

The parties have filed briefs and submitted evidence in support of their respective positions.  Plaintiff submitted a brief and evidence[1] (doc. # 33) in support of his motion for summary judgment on April 25, 2005.  Defendants submitted a brief (doc. # 36) on May 16, 2005, and evidence[2] (doc. # 37) in

---

[1]  The plaintiff submitted the following evidence: United Mine Workers of America 1974 Pension Plan, 1993 version; United Mine Workers of America 1974 Pension Plan, January 1, 2002 version; deposition of James B. Dexter, FSA; report of James B. Dexter, FSA; and affidavit of Malcolm Macphee, FSA, with attached report.

[2]  The defendant submitted the following evidence: affidavit of Linda Fritz; Green claim file; UMWA Trust Benefit Plan; UMWA Pension Trust; Trust Questions and Answers; complaint earlier case filed in Circuit Court of Jefferson County (cv-3715) on 06/20/2000; removal of that case to Northern District of Alabama; answer in that case; 02/09/01 letter from Nakamura to Patton; dismissal of that case; and report of James B. Dexter, FSA.

support of their own motion for summary judgment on May 17, 2005. On May 31, 2005, plaintiff filed a brief (doc. # 38) in reply to defendants's opposition and in response to defendants' motion for summary judgment. With leave of court, on August 18, 2005, plaintiff filed a supplemental brief in support of his motion for summary judgment, and on August 29, 2005, defendants filed a response to this supplemental brief. All briefs and evidence have been considered.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there

is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine

4

issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may

come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

Plaintiff, Herman J. Green, is a former coal miner who seeks interest on

disability pension benefits that he received from the UMWA 1974 Pension Trust

("the Trust").  Defendants are the Trustees of the Trust, one of several employee

benefit trusts that collectively are known as the UMWA Health and Retirement

Funds ("the Funds").  The Trust was established under the National Bituminous

Coal Wage Agreement of 1974 and in accordance with Section 302(c) of the

Labor-Management Relations Act of 1974, 29 U.S.C. § 186(c).  The benefits that

the Trust provides are the result of collective bargaining between the UMWA and

---

[3]  Although there are cross-motions for summary judgment, each side must still establish
the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.
See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S., 224 F.2d 338, 345 (5th Cir.
1955); Matter of Lanting, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider
each motion independently, and in accordance with the Rule 56 standard.  See Matsushita Elec.
Indus. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  "The fact that both parties
simultaneously are arguing that there is no genuine issue of fact, however, does not establish that
a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  See
WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed.
1998).

the Bituminous Coal Operators' Association, Inc. and are set forth in the UMWA

1974 Pension Plan ("the Plan").

### A.   The Plan

The Plan provides that a participant who becomes totally disabled as a result

of a mine accident shall be eligible for a pension while disabled upon retirement.

(Def. Ex. 1.B. at 7.)  Article II.C further provides the definition of "totally

disabled" under the Plan:

> A Participant shall be considered to be totally disabled only if by
> reason of such [mine] accident such Participant is subsequently
> determined to be eligible for Social Security Disability Insurance
> Benefits under Title II of the Social Security Act or its successor.

(Id.)  Therefore, under the Plan, a plaintiff first must establish disability under the

SSDI system and then must prove that there is a causal link between a mine

accident and the disability reflected in his SSDI award.  (Id.)

The Plan further provides that "[t]he Trustees … shall have full and final

determination as to all issues concerning eligibility for benefits." (Id. at 32.)

In addition, Article IV of the Trust states that the Trustees "shall have full

discretionary power to construe the provisions of this Agreement and Declaration

of Trust and the Plan." (Def. Exhibit 1.C at 5.)  The Trustees are also empowered

to issue rules and regulations to implement the Plan.  (Def. Exhibit 1.B at 32.)

Under the authority granted the Trustees in Article VIII.B.(1) of the Plan, the Trustees developed a series of interpretive guidelines called "Questions and Answers" ("Qs&As") to help them interpret the provisions of the Plan in a uniform and consistent manner. (Fritz Declaration at 3.)  In particular, the Trustees adopted Q&A 252 to address the question of when a claimant is "totally disabled as the result of a mine accident."  Q&A 252 provides that a miner is totally disabled as a result of a mine accident if there is:

> (1) Unexpectedness: The disability must have been unlooked for and unforeseen; (2) Definiteness: The disability must be traceable to a definite time, place and occasion which occurred within the course of the mineworker's employment. A progressive disease does not meet this test and therefore cannot be a disability that resulted from a mine accident; (3) Force or impact: The disability must have been caused by the exertion or impact of some external physical force or object against the body or by the exertion or impact of the body against some external physical object; i.e., not simply the result of the mine worker's own physical condition.

(Def. Ex. 1.D.)  Progressive diseases, such as arthritis or degenerative disc disease, are excluded as disabilities considered the result of a mining accident.  (See Fritz Declaration at 3; Q&A 252.)

## B.  The Mine Accident

Green filed an accident report on May 13, 1990, and reported that he had been injured while on the job on March 9, 1990.  (Def. Ex.1.A. at 78.)  The

accident report states that Green's back was strained while he "operating [a] Terex

pan," which is a piece of heavy equipment.  (Id.)  The accident report does not

give any other details regarding the accident.

### C.  The Beginning of Green's Pension Application Process

#### 1.  Application for SSDI

On October 14, 1993, Green applied for SSDI from the Social Security

Administration. (Def. Ex. 1.A. at 82.)  This application was denied on January 27,

1994. (Id. at 82, 96.)  The primary diagnosis was back strain, but it was not

considered disabling.  (Id. at 96.)  On reconsideration, Green's SSDI application

was again denied because the medical evidence did not show that he was disabled.

(Id. at 94-95.)  On August 20, 1996, an Administrative Law Judge ("ALJ") upheld

the denial, but on November 7, 1997, the Appeals Council vacated the ALJ's

decision and ordered that additional medical evidence, including additional

psychiatric evidence, be obtained.  (Id. at 82.)

On remand, a different ALJ found that the medical evidence showed that

Green suffered from chronic back pain since an "on-the-job injury in 1990." (Id. at

83.)  The ALJ rejected the opinion of various physicians that Green was capable of

performing a range of sedentary and light work activity. (Id. at 84-85.)  Finally, on

May 2, 1998, the ALJ found that Green was disabled as of February 3, 1993, due

9

to degenerative disc disease of the lumbar and cervical spine, hiatal hernia,

duodenal ulcer, and adjustment disorder with depression. (<u>Id</u>. at 85.)  On May 2,

1998, SSA notified Green that he was eligible for SSDI benefits. (<u>Id</u>. at 79-87.)

### 2. Pension Application and First Denial

On February 8, 1995, while his SSDI application was still pending on

appeal, Green applied for a disability pension with the Trustees. (<u>Id</u>. at 101-05.)

In his application, he described the event that led to his disability as "shocks on

seat out – continuous bouncing up and down causing back pain" and indicated that

the injury occurred on March 9, 1990. (<u>Id</u>. at 103.)  He stated that his SSDI

application was denied but under appeal. (<u>Id</u>.)

On February 22, 1996, the Trustees inquired whether he had received an

SSDI award. (<u>Id</u>. at 100.)  A notation on the February 22, 1996 letter states that, as

of March 4, 1996, Green was "still waiting on decision." (<u>Id</u>.)  On July 8, 1996,

the Trustees informed Green that his pension application was denied because he

had not established that he met the medical requirements for SSDI, which is one of

the eligibility requirements for a disability pension under the Plan. (<u>Id</u>. at 99.)

### 3. Reopening of Green's File and Second Denial

On May 18, 1999, the Trustees received a copy of Green's SSDI award and

reopened his file. (<u>Id</u>. at 79.)  On July 26, 1999, however, the Trustees notified

10

Green that his pension application was again denied because the evidence in the record indicated that the March 9, 1990 incident did not meet the Plan's definition of mine accident. (Id. at 71-76.)  The Trustees noted that the accident report did not contain a description of the incident and did not indicate a time that the injury occurred. (Id. at 72.)  Instead, the accident report simply stated that the back strain occurred while Green was operating a Terex pan.  (Id.)  In addition, the Trustees noted that Green did not report the incident until May 13, 1990, more than two months after the alleged accident.  (Id. at 78.)

The Trustees gave a thorough account of the medical records reviewed in making the decision.  According to the medical records, Green did not seek medical attention until May 23, 1990. (Id. at 72.)  These medical records described an x-ray within normal limits and no evidence of herniated disc. (Id.)  A CT scan on May 23, 1990 was negative. (Id.)  The diagnosis was severe lumbosacral strain. (Id.)  Green continued to operate heavy machinery for at least a month after the March 9, 1990 incident. (Id. at 75.)  A treatment note indicated that Green had requested underground work, instead of his normal job driving equipment, because of "pounding to his back." (Id. at 72.)

The next record of medical treatment for back problems was January 23, 1991, when Green experienced sharp pains in his lower back while performing his

11

regular work duties. (Id.)  Various treatment records show intermittent complaints of back pain every six months or so without additional trauma until Green ceased working in January 1993.[4] (Id. at 72-73.)

Then, on May 1, 1995, Dr. Todorov concluded that Green had significant psychological overlay with an extremely demanding personality, and anger towards the coal company. (Id.)  Dr. Todorov also stated that Green would probably not be able to work in his present state of mind. (Id.)

The Trustees found that Green's disability was caused by degenerative disc disease, hiatal hernia, duodenal ulcers, and adjustment disorder with depression. (Id. at 75.)  The Trustees determined that the hiatal hernia and duodenal ulcers had no causal relationship to the alleged mine accident. (Id. at 76.)  In addition, the Trustees found that there was very little information in his file concerning the adjustment disorder and, thus, no evidence of a causal link to the alleged mine accident. (Id.)

With respect to the degenerative disc disease, the Trustees observed that it is a progressive condition brought on by the normal wear and tear process associated with aging, and that, in Green's case, it appeared that he had regular flare ups of

---

[4] The Trustees noted that a motor vehicle accident in August 1993 had caused Green's cervical problems, and that Dr. Craddock had opined, on December 15, 1993, that the motor-vehicle accident had prevented Green from returning to work in the mines. (Id. at 74.)

the disease over a long period of time before his disability arose.  (<u>Id</u>. at 76.)
In addition, the Trustees noted that the cervical problems appeared to stem from a
motor vehicle accident in 1993 that was not work related.  (<u>Id</u>.).

Green submitted a request for a hearing to appeal the denial of his
application. (<u>Id</u>. at 70.)  On November 12, 1990, the Trustees held a pre-hearing
conference with Green and his attorney. (<u>Id</u>. at 76.)  At that conference, the
Trustees explained the basis for their denial of Green's application; namely, that
the claimed mine accident did not meet the unexpectedness and definiteness
criteria. (<u>Id</u>.)  Green's attorney requested and received additional time to submit
more information about Green's accident. (<u>Id</u>.)

### 4.  <u>The Third Denial</u>

On April 25, 2000, the Trustees again notified Green that his application for
disability pension benefits was denied. (<u>Id</u>. at 59-65.)  The denial notice concluded
that Green's March 9, 1990 back injury was caused by a rough-riding piece of
equipment over the course of an entire shift, and Green had denied that it was
attributable to any specific moment of injury. (<u>Id</u>. at 61.)  Therefore, the injury was
not traceable to a definite time, place and occasion as required under the Plan;
consequently, it lacked the requisite definiteness.   (<u>Id</u>.)  The denial notice also
observed that there was no documentation in the file to show that the piece of

13

equipment was defective or that the ride was any rougher than normal. (Id. at 63.)

In addition to this finding, the Trustees noted that the evidence did not show that the March 1990 injury was the substantial cause of Green's disability in 1993. (Id.).  According to Green's SSDI award, he was disabled due to degenerative disc disease of the lumbar and cervical spine with stenosis, hiatal hernia, duodenal ulcer, and adjustment disorder with depression. (Id. at 60, 64.)  The Trustees noted that the progressive diseases, such as degenerative disc disease and arthritis, are excluded from the type of conditions considered the result of mine accident under Q&A 252. (Id. at 64.)  Although it is possible for a mine accident to aggravate a progressive disease sufficiently to constitute a substantial cause of disability, the Trustees found that the evidence in the record at that time showed only that the type of work that Green performed routinely may have exacerbated the degenerative changes to his lumbar spine.[5] (Id.)  Based on the foregoing, the Trustees concluded that, even if the March 1990 incident were considered a mine accident, Green had not established that it caused his disability. (Id. at 65.)

---

[5]  The cervical spine condition appeared related to a car accident in August 1993 and did not have a causal link to any mine accident. (Id.)  The Trustees further noted that the disabling hiatal hernia and duodenal ulcers were not related to a mine accident and that the first evidence of adjustment disorder in the file is Dr. Mohabbat's evaluation of June 1995, more than five years after the alleged mine accident. (Id.)

*D.  Green's Suit for Benefits*

On June 20, 2000, Green filed a complaint against the Trustees in the Circuit Court of Jefferson County alleging the wrongful denial of his disability pension application. (Def. Ex. 2.)  The Trustees removed the matter to federal court and answered on August 8, 2000. (Def. Exs. 3 and 4.)  On February 9, 2001, as the result of discussions among the parties, the Trustees wrote to Green's attorney and informed him that they would agree to a dismissal without prejudice and permit Green to submit additional evidence that he was in a mine accident that caused his disability. (Def. Ex. 5.)  The parties submitted a joint stipulation and motion for dismissal without prejudice on February 20, 2002, and the court granted this motion on February 23, 2001. (Def. Ex. 6.)

*E.  Submission of Additional Evidence and Favorable Decision*

On July 1, 2001, Green's attorney submitted additional information including sworn testimony of Green from May 23, 2001 and a video tape of the testimony. (Id. at 34-58.)  Green testified that he was injured on March 9, 1990 when he was driving some mining equipment with bad shocks and that his back was injured "instantly" when he hit a bump on his first run. (Id. at 38.)

On February 27, 2002, the Trustees wrote to Green and confirmed that a hearing was scheduled for March 26, 2002. (Id. at 33.)  At the hearing, Green's

attorney requested a continuance to present additional information and the request was granted. (Id. at 26.)  The Trustees received additional information on March 29, 2002. (Id. at 29-32.)

_____On April 29, 2002, the Trustees completed their review of Green's new evidence[6] and determined that the events of March 9, 1990 met the definition of "mine accident" under the Plan. (Def. Ex. 1.A. at 21-28.)  Although Green's attorney had submitted some of the additional evidence on July 1, 2001, the Trustees concluded that evidence indicated that Green could not identify a specific event that triggered the back injury and that the back pain progressed over the course of his whole shift. (Exhibit A at 25-26.)  This description of the incident as a non-specific event is similar to what Green put on his disability pension application. (Id. at 103.)  However, at the hearing on March 26, 2002, Green and his attorney clarified that Green meant that there was more than one "bump" that caused his injury, rather than that no single "bump" resulted in his injury. (Exhibit A. at 26, 27.)

---

[6]The evidence included: (1) excerpts from a deposition in which Green answers questions from his attorney; (2) a worker's compensation complaint; (3) Jim Walter Resource's answer to the complaint; (4) a request for admission of facts in the worker's compensation case and a response thereto; (5) letters containing medical opinions from various doctors; (6) portions of appellate briefs in the worker's compensation case; (7) transcripts from Green's testimony in his workers' compensation trial; and (8) a letter from a Jim Walters Resources' employee to Green. (Id.)

The Trustees also found that a written statement, dated March 27, 2002, from Green's coworker about the 1990 accident was credible.  The coworker stated that he recalled Green complaining that his back hurt after the equipment he was operating hit a pothole.  (Id. at 27.)  This statement corroborated Green's statements that there was a specific event that caused his injury.  (Id.)  The Trustees received this statement from Green's attorney on March 29, 2002. (Id. at 29-32.)  The Trustees also relied on the records showing that the equipment was repaired around the time of Green's back injury and that, upon pain of losing his job, Green was forced to keep using it in a broken condition.  (Id.)  The Trustees found that these records tended to indicate that the injury was unexpected in that the equipment was defective and not operating in its usual manner. (Id.)

Based on this new information, the Trustees concluded that the March 9, 1990 incident met the definition of a mine accident. (Id.)  In addition, they informed Green that the medical evidence in his file was being reviewed to determine whether the 1990 mine accident had caused the disability that arose in December 1993. (Id. at 21.)

On November 21, 2002, the Trustees notified Green that his application for a disability pension was approved and that they had determined that his 1990 mine accident had substantially contributed to his disability that began in December

17

1993. (Def. Ex. 1.A at 15.)  The notification letter indicated that Green's pension effective date was January 1, 1994[7] and that the enclosed check covered all monthly payments from the effective date through December 31, 2002. (Id.)  The letter also indicated that Green would receive future monthly payments at the beginning of each month. (Id.)  The notification letter contained a detailed description of the medical evidence in Green's file and provided an explanation of the Trustees' conclusion that the 1990 mine accident had substantially contributed to his degenerative disc disease. (Id. at 17-20.)

### F.  Green's Claim for Interest

On January 6, 2003, Green's attorney inquired if Green was entitled to interest on the retroactive portion of his disability pension.  (Id. at 5.)  The Trustees responded, on January 10, 2003, that Green was not entitled to any interest because the Plan does not have any provision for the payment of interest on the retroactive portion of disability pensions.  (Id. at 4.)

### IV. Applicable Substantive Law and Analysis

Green contends that the Trustees' refusal to pay interest on his disability benefits violates ERISA.  Green could potentially recover interest under two sections of the statute.  The court will address each section separately.

---

[7]  Green chose the later effective date and the larger payments. (Id. at 15.)

*A.  Section 502(a)(1)(B)*

Section 502(a)(1)(B) authorizes a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Defendants assert that the Eleventh Circuit's holding in Flint v. ABB, Inc., 337 F.3d 1326 (11th Cir. 2003), precludes plaintiff from recovering interest on his disability benefits under this section.  Defendants are correct.

In Flint, an employee plan participant sued the plan administrator to recover interest on a payment for retroactive plan benefits.  Id. at 1327.  The plaintiff had been receiving disability payments for around three years when the plan administrator determined that he was no longer "totally disabled" within the meaning of the plan and notified him that benefits would be terminated.  Id. at 1328.  The plaintiff appealed the termination, and ultimately the plan reinstated his benefits and awarded him retroactive benefits for the termination period.  Id.  The plaintiff sued under section 502(a)(1)(B) and asserted a claim for the interest on the retroactive payments he had already received.  Id.  The Eleventh Circuit Court rejected the plaintiff's argument that payment of interest was an implied term of the plan, and held that "only benefits specified in the plan can be recovered in a

suit under section 502(a)(1)(B)." Id. at 1329 (citation omitted).   Because the plan
at issue did not provide for interest, the plaintiff failed to state a claim under
section 502(a)(1)(B).  Id. at 1329-30.

The Eleventh Circuit's holding in Flint is controlling on plaintiff's claim.
Just as in this case,  in Flint, the defendant voluntarily paid the plaintiff for
retroactive benefits, and the plaintiff attempted to assert a separate claim solely to
recover interest on the payment.  The Flint court held that section 502(a)(1)(B),
which permits a claim "to recover benefits due to [plaintiff] under the terms of the
plan," did not support an independent claim for interest unless it was permitted
under the terms of the plan.  Id. at 1329.  As in the plan in Flint, the terms of the
plan do not permit payment of interest.  Flint, therefore, precludes plaintiff's claim
for interest under section 502(a)(1)(B).

### B.  Section 502(a)(3)

Section 502(a)(3) authorizes a civil action "(3) by a participant, beneficiary,
or fiduciary . . . (B) to obtain other appropriate equitable relief (i) to redress such
violations or (ii) to enforce any provisions of this subchapter or the terms of the
plan."  29 U.S.C. § 1132(a)(3).  Under this section, "equitable relief" means "those
categories of relief that were typically available in equity."  Mertens v. Hewitt
Assocs., 508 U.S. 248, 256 (1993).  Several courts of appeals have authorized an

award of interest as a form of equitable relief under section 502(a)(3).  <u>See</u>

<u>Dunnigan v. Metro. Life Ins. Co.</u>, 277 F.3d 223, 229 (2d Cir. 2002) ("Where

interest is sought to make the plaintiff whole by eliminating the effect of a

defendant's breach of a fiduciary duty, we see no reason why such interest should

not be deemed 'appropriate equitable relief' within the scope of § 502(a)(3)(B).");

<u>Clair v. Harris Trust & Sav. Bank</u>, 190 F.3d 495, 498-99 (7th Cir. 1999); <u>Fotta v.</u>

<u>Trs. of the United Mine Workers of Am.</u>, 165 F.3d 209, 213 (3rd Cir. 1998)

(stating that section 502(a)(3) is the appropriate vehicle for cause of action for

interest on delayed payments).  These cases, however, were decided before the

Supreme Court's decision in <u>Great-West Life & Annuity Insurance Co. v.</u>

<u>Knudson</u>, 534 U.S. 204 (2002).

 In <u>Knudson</u>, the plaintiff health care plan brought a claim for specific

performance of a reimbursement provision of the plan against the beneficiary of

the plan.  <u>Id.</u> at 183.  The beneficiary was involved in an automobile accident, and

filed suit against the auto manufacturer and others and received a settlement in her

favor.  <u>Id.</u> at 207.  Only a portion of the settlement was allocated to reimburse the

health care plan.  <u>Id.</u>  The Supreme Court concluded that the plaintiffs were

essentially seeking to impose personal liability on defendants for a contractual

obligation to pay money, and stated that "[a] claim for money due and owing

21

under a contract is quintessentially an action at law." Id. at 210. The Court held that the plaintiff could not recover under section 502(a)(3) because although the plaintiff characterized her claim as an equitable claim, it was actually a legal claim because the plaintiff did not seek to recover from a particular fund or property in the defendant's possession, but to impose personal liability on defendants. Id. at 214. The Court recognized that a recovery for restitution may be for restitution at law or restitution at equity, and only the latter could be considered "appropriate equitable relief" under section 502(a)(3).[8] Id. at 213. .

In Flint, the Eleventh Circuit opined that "[t]he Court's decision in Knudson . . . raises the question whether § 502(a)(3) ever allows an award of interest for delayed benefits or whether such a claim is an impermissible attempt to dress an essentially legal claim in the language of equity." Flint, 337 F.3d at 1331. The Eleventh Circuit, however, did not reach the issue, holding instead that even assuming that section 502(a)(3) permitted the recovery of interest, the plaintiff had failed to state a claim, in part, because he failed to plead facts which would show that the defendant unduly delayed in the appeals process or wrongfully refused to

---

[8]  For instance, the Supreme Court recognized that while restitution may be an equitable remedy it can also be a legal remedy. 534 U.S. at 213. Whether it is legal or equitable depends on the basis for the plaintiff's claim and the nature of the underlying remedies. Id. Therefore, for restitution to lie in equity, the action generally must seek to restore to the plaintiff particular funds as opposed to impose personal liability on the defendant. Id. at 214.

reinstate his benefits.  Id.

To determine whether section 502(a)(3) allows an award of interest for delayed benefits after Knudson, and since the Eleventh Circuit has yet to specifically address this question, the court looks to decisions rendered in other circuits that have considered the effect of Knudson on claims for interest for breach of fiduciary duty under § 502(a)(3).  Two other circuits have addressed the issue, and both concluded that interest is a permissible remedy under section 502(a)(3).

In Parke v. First Reliance Standard Life Insurance Co., 368 F.3d 999, 1006-07 (8th Cir. 2004), the district court awarded prejudgment interest to the plaintiff beneficiary seeking long-term disability benefits for a period when the plaintiff's benefits were wrongfully delayed.  Id. at 1003. The defendant plan administrator argued that Knudson narrowed the definition of appropriate equitable remedy and that interest was no longer a permissible remedy.  Id. at 1006-07.  The Eighth Circuit disagreed and reasoned that because the district court awarded interest under the theory of accounting for profits, an equitable remedy, the pertinent inquiry was whether the award of interest could actually be considered an accounting for profits, or whether it represented a legal claim disguised in equitable terms.  Id. at 1007.  The Eighth Circuit stated that "[u]nder traditional

23

rules of equity, a defendant who owes a fiduciary duty to a plaintiff may be forced to disgorge any profits made by breaching that duty, even if the defendant's breach was simply a failure to perform its obligations under a contract." Id. at 1008. Therefore, the court held that the defendant could be forced under section 502(a)(3) to disgorge any profits it earned as a result of that wrongful conduct. Id. at 1009. Because this was a remedy typically available in equity, the Eighth Circuit concluded that it was permissible after Knudson. Id.

Similarly, in Skretvedt v. E.I. Dupont De Nemours, 372 F.3d 193 (3rd Cir. 2004), the plaintiff sued for payment of disability benefits, including a separate claim for interest based on a delay in payment on benefits the employer voluntarily paid. Id. at 195. With respect to this interest issue, the Third Circuit concluded that Knudson did not preclude a claim under section 502(a)(3). Id. at 213-14. After examining the ability to assert an independent claim for interest after Knudson, the Third Circuit determined that the plaintiff could seek appropriate equitable relief in the form of a constructive trust to force the defendant to disgorge the gain it received on his withheld benefits under a theory of restitution. Id. at 214. Furthermore, the court reasoned that the ERISA plan's funds provided the specific property in the defendant's possession, as opposed to imposing personal liability. Id.

24

Although the court is persuaded by the reasoning of the Third and Eighth Circuits, like the Eleventh Circuit in <u>Flint</u>, this court does not need to decide the issue.  Even assuming that interest is permissible under section 502(a)(3)(B), Green's claim fails because the delay in the payment of benefits was not wrongful as a matter of law.  <u>See</u> <u>Flint</u>, 337 F.3d at 1331 (citation omitted); <u>see</u> <u>also</u> <u>Fotta v. Trs. of the United Mine Workers of Am.</u>, 319 F.3d 612, 616-17 (3rd Cir. 2003).

As stated above, section 502(a)(3)(B) allows a beneficiary to sue only "(i) to redress [violations of ERISA or the terms of an ERISA plan] or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C.  1132(a)(3)(B). This section, therefore, "does not . . . authorize appropriate equitable relief <u>at large</u>, but only 'appropriate equitable relief' for the purpose of 'redress[ing any] violations or enforc[ing] any provisions of ERISA or an ERISA plan."  <u>Fotta</u>, 319 F.3d at 616 (citations omitted).  As such, an ERISA beneficiary who seeks interest on delayed payments must first prove that those payments were withheld in violation of the ERISA plan or of ERISA itself.  <u>See</u> <u>Flint</u>, 337 F.3d at 1331 (citing Clair, 190 F.3d at 499) (holding that plaintiff was barred from collecting accrued interest when employer disbursed benefits according to the procedure and the time period outlined in the employee-benefit plan)).

25

### 1.  <u>No Violation of the Plan</u>

Green contends that the Trustees wrongfully delayed his benefits.  (Pl. Br. at 39-41; Pl. Reply Br. at 7-8.)  The Trustees argue that the delay, although long, was not in violation of the plan, and, therefore, was not wrongful.  (Def. Br. at 37-46.)  The court agrees with the Trustees.

To prove that the Trustees acted wrongfully, Green must meet a high standard.  The Plan granted the Trustees discretion in making eligibility determinations, giving it "full and final determination as to all issues concerning eligibility for benefits."  (Def. Ex. 1.B at 32.)  As such, the Trustees' eligibility determinations are wrongful only if they are arbitrary and capricious.  <u>Brown v. Blue Cross & Blue Shield of Ala.</u>, 898 F.2d 1556, 1558 n.1 (11th Cir. 1990); <u>see also</u> <u>Fotta</u>, 319 F.3d at 617.

ERISA prohibits the Trustees from paying claims before an applicant demonstrates that he meets the eligibility requirements of the Plan.  <u>See</u> <u>Flint</u>, 337 F.3d at 1331 (ERISA fiduciaries have a duty to protect and preserve plan assets for legitimate beneficiaries).  Under the Plan, the Trustees provides disability benefits only when the applicant has carried his burden of proving three things: (1) that he was in a mine accident; (2) that he is totally disabled as demonstrated by receipt of

SSDI benefits;[9] and (3) that the mine accident caused his disability. See, e.g., McCoy v. Holland, 364 F.3d 166, 170 (4th Cir. 2004); Fotta, 319 F.3d at 614; Odom v. UMWA Heath & Ret. Funds, 687 F.2d 843, 847 (6th Cir. 1982). Green was not entitled to any benefits until he satisfied these eligibility requirements. As such, no wrongful delay occurs under the Plan, as a matter of law, until benefits were overdue.

Green has failed to show that the Trustees acted arbitrarily and capriciously in initially denying his claim for benefits or in any delay. Instead, as demonstrated by the court's recitation of the undisputed facts regarding the extensive determination process,[10] see section III.C-E supra, the Trustees acted reasonably in evaluating Green's disability claim that he was rendered totally disabled more than three years after he strained his back while driving a piece of mining equipment. These facts reveal that the Trustees, Green, and Green's attorney worked together to ensure that Green presented sufficient evidence of eligibility. The Trustees repeatedly allowed Green to supplement the record, and, as accurately noted in the

---

[9]  The court rejects Green's argument that the word "subsequently" somehow allows for a beneficiary to be entitled to payment before he demonstrates his total disability through the receipt of a SSDI award. (Pl. Br. at 13, 17-18.) As correctly argued by the Trustees, Green's argument "conflicts with ERISA's requirement that the Trustees only pay eligible beneficiaries . . . . [and] . . . ignores the more obvious antecedent of 'subsequently' which is the 'mine accident.'" (Def. Br. at 39.)

[10]  The court will not again set out the facts regarding the eligibility determination.

Trustees' brief, allowed Green to gradually change his description of the 1990 incident to ultimately meet the definition of "mine accident" under the Plan.  The Trustees also carefully (and painstakingly) reviewed all the medical evidence presented by Green to ensure that this accident actually caused Green's disability.

Based on the record, the delay in benefits was not arbitrary and capricious. More than six years passed before Green was awarded SSDI benefits, a prerequisite for eligibility under the Plan.  In addition, the record shows that the Trustees gave Green more than enough opportunity to show that he met the other eligibility requirements and timely evaluated all new evidence presented.  Each denial was fully explained and always allowed Green to challenge the decision. As such, the court finds that the Trustees did not act arbitrarily and capriciously in the delay in benefits under the Plan.

## 2. No Violation of ERISA

Green's alternative argument is that the Plan itself violates ERISA because it does not provide for interest payments.  (Pl. Br. at 31-44.)  He contends that the nonpayment of interest violates ERISA's anti-cutback provisions.  (Id.)  This argument fails.

The "anti-cutback" rule prohibits a plan amendment from decreasing a

28

participant's "accrued benefits."  29 U.S.C. § 1054(g); see Cent. Laborers'

Pension Fund v. Heinz, 541 U.S. 739, 746-47 (2004).  The rule derives from 29

U.S.C. section 1054(g)(1), which provides that "[t]he accrued benefit of a

participant under a plan may not be decreased by an amendment of the plan."

Accrued benefit means, "in the case of a defined benefit plan, the individual's

accrued benefit determined under the plan and . . . expressed in the form of an

annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23).

Furthermore, the statute provides that "a plan amendment which has the effect of .

. . eliminating or reducing an early retirement benefit or a retirement-type subsidy .

. . with respect to benefits attributable to service before the amendment shall be

treated as reducing accrued benefits."  Id. § 1054(g)(2).

No aspect of Green's benefit was reduced by the Trustee's amendment or

interpretation of the Plan.  The settlors of the Trust omitted interest from the

pension benefits that are provided in the Plan.  Because of the realities of

collective bargaining, "because finite contributions must be allocated among

potential beneficiaries, inevitably financial and actuarial considerations sometimes

will provide the only justification for an eligibility condition that discriminates

among potential applicants for benefits."  UMWA Health & Ret. Funds v.

Robinson, 455 U.S. 562, 575 (1982).  Here, the settlors bargained for a disability

pension benefit that required satisfaction of three eligibility requirements that necessitate a delay between the onset of the disability and the receipt of the benefit.  Green received that benefit in accordance with the terms of the Plan.  No cutback occurred as the Trustees have not "amended" the Plan in any way, through interpretation or otherwise.[11]

In summary, the court finds that no material issues of fact remain and that defendants are entitled to judgment as a matter of law as to all claims asserted by plaintiff.[12]

A separate order will be entered.

DONE this 14th day of December, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[11]   In addition, the qualified disability benefits that Green receives are not an "early retirement benefit or retirement-type subsidy" as those terms are used in section 204(g)(2).

[12] This decision renders moot any issue of class certification.